477 So.2d 166 (1985)
John BROUSSARD, et al., Plaintiffs-Appellants,
v.
CROCHET, BROUSSARD & CO., Defendants-Appellants.
No. 84-673.
Court of Appeal of Louisiana, Third Circuit.
October 10, 1985.
*168 Porteus Burke, New Iberia, for plaintiffs-appellants.
Armentor & Wattigny, Gerard V. Wattigny, New Iberia, for defendants-appellants.
Before STOKER, DOUCET and KNOLL, JJ.
KNOLL, Judge.
All partners of the accounting partnership Crochet, Broussard & Company bring this appeal. John Broussard and Paul *169 Broussard, plaintiffs, appeal contending that the trial court erred in: (1) failing to find Paul Crochet, the senior partner, owed reimbursement to John Broussard and Paul Broussard for unbilled accounting time to Tri-Parish Oil Company from 1977-1982; (2) failing to find Paul Crochet relinquished ten percent of his partnership share of the profit for 1981; (3) failing to find Paul Crochet was fully compensated for his work in the partnership when he agreed to an hourly rate of pay and a specified monthly draw as part of his retirement in lieu of his 35% partnership interest; (4) failing to find Paul Crochet liable to John Broussard and Paul Broussard for damages for their wrongful eviction from the partnership office; (5) failing to award John Broussard and Paul Broussard reimbursement from Paul Crochet for partnership funds which were paid for a set of automobile tires for his personal use, forty-four hours of vacation time, and an educational trip to San Francisco; and (6) failing to require Paul Crochet to reimburse the partnership for rent increases from January 1, 1982, to October 18, 1982.
Paul Crochet and Mike Crochet, defendants, assign as error that the trial court: (1) erroneously denied their plea of prescription to John and Paul Broussard's assertion that interest charged on a promissory note by Paul Crochet was usurious; (2) wrongfully maintained John and Paul Broussard's writ of sequestration; (3) erroneously determined that movable assets owned by Paul Crochet from October 1, 1959, to January 1, 1973, were partnership assets; and (4) wrongfully denied Paul Crochet's claim against John Broussard for an accounting on an accrual conversion basis for monies received by John Broussard at the time he became a percentage partner in 1973.

FACTS
The learned trial judge favored us with written reasons for judgment, setting forth the facts, which we incorporate herein:
"The plaintiffs, John Broussard and Paul Broussard, were members of an accounting partnership composed of themselves and Paul Crochet and Michael Crochet....
Paul Crochet was the senior member of this partnership and the founding partner. The principal parties in this lawsuit are Paul Crochet and John Broussard, who were the original partners in the firm of Crochet and Broussard. Prior to the formation of the partnership, Paul Crochet had been practicing public accounting for some years. In 1967 John Broussard was employed as an accountant by Paul Crochet's firm, which was then known as Crochet, Dressel and Friend. In 1968 John Broussard became a certified public accountant and continued to work for the firm as an employee, until July 1, 1971 when he was taken in as a partner. At that time the firm name was Crochet, Friend and Company, and John Broussard was termed what they call a partner with a guaranteed salary but no ownership of any assets. On January 1, 1973, John Broussard became a partner with Paul Crochet on a profit sharing basis, and the name of the firm then became Crochet and Broussard, CPAs. At that stage, John Broussard was a junior partner but later the agreement was to divide the assets equally between the two partners. In early 1980, two new junior partners, named Paul Broussard and Michael Crochet, were taken into the firm. Paul Broussard is not a relative of John Broussard, however, Michael Crochet is the son of Paul Crochet. Both of these junior partners had been employees of the firm but they ultimately became partners, so that Paul Crochet had a 35 percent interest, John Broussard had a 35 percent interest, and Paul Broussard and Michael Crochet each had a 15 percent interest.

The firm obviously prospered and there seemed to have been no great difficulties among the partners. What gave rise to this litigation was the commencement and ultimately the termination of talks between the partners *170 concerning the retirement of Paul Crochet. In the middle of 1981 Paul Crochet announced that it was his intention to open discussions concerning his possible retirement. He told the partners that if he could slow down his work schedule for the remainder of 1981 that he would agree to give 10 percent of his partnership interest to the partnership for distribution.... Almost at the same time that he made the decision to give this 10 percent, a particularly difficult case arose that took the special time of Paul Crochet himself, indicating to him that he would have to do a lot of work and spend a lot of time on it. There appears to have been no dissention as to this course of action at this time. In December of 1981, and later, numerous conferences were had concerning the retirement or slow down [sic] of Paul Crochet. Numerous memoranda were exchanged between Paul Crochet and basically John Broussard and Paul Broussard in an attempt to reach an amicable solution for the retirement of Paul Crochet. This occurred in early 1982, which, of course, is the tax season and a very busy season. Generally these discussions centered on two principal points and the parties came very close to an arrangement. One of the points involved the compensation that was to be paid to Paul Crochet on his retirement and the other involved a lease on the building. The building in which the partnership operated was owned individually by Paul Crochet. Paul Crochet wanted to tie in his retirement to compensation, and to a long-term lease on the building. There were a few other minor items to be settled but the main one ultimately became the long-term lease on the building. Basically Paul Crochet wanted a 15-year lease on the building and he wanted it in the fashion of a five-year lease with two options to renew with he, Paul Crochet, having the right to exercise the options ... John Broussard, on the other hand, agreed to this basic lease but he wanted to have the lessee, the new partnership, have the option of exercising renewals of the lease at the end of each five years. As far as this Court can determine, that is where the breakdown occurred between the parties... In September of 1982, they were still trying to resolve these issues but the communications between the parties apparently broke down. Several memos were submitted from one side to the other, and nothing could be agreed upon. Finally, on October 18, 1982, the parties signed an agreement termed `Partnership Termination Agreement' terminating the partnership of Crochet, Broussard and Company, effective 5:00 p.m., October 18, 1982, reserving to the parties the right to recover from each other as they saw fit. And on October 21, 1982, there was a termination of lease agreement whereby Paul Crochet and the remaining partners agreed to terminate the month-to-month lease between Paul Crochet and the partnership as of October 31, 1982, giving Paul Broussard and John Broussard the right to use the premises for the purpose for which they were presently being used, at a rental of $20.84 a day, providing that this continued use would terminate on November 10, 1982. At this stage, John Broussard and Paul Broussard were allied on one side, and Paul Crochet and his son were allied on the other.

* * * * * *

The relationship between the partners was strained indeed, and the Broussards were in the process of opening up an office somewhere in New Iberia. During this time they would frequently come to the Crochet building to handle work or to get files or to use the office machines. Paul Crochet became upset because he felt that the Broussards were removing files and equipment that were in fact owned by the partnership and not by the individual partners, and ultimately he prevented them from returning to his building any *171 longer. This was on November 3, 1982, and he did it contending he wanted to preserve the integrity of the partnership, assets and files. [On November 9, 1982,] ... this litigation was filed, a liquidator was appointed by the Court, and the liquidator took control of the files and movable assets and removed them from the partnership premises and has them under his control. Since then, some of these files have been distributed to the various partners but some items are still under the control of the liquidator."

The partnership agreement was never reduced to writing.

CROCHET'S 10% RELINQUISHMENT OF PARTNERSHIP SHARE
In mid-1981 Paul Crochet announced to the partners that if he could slow his work schedule for the remainder of the year, he would relinquish 10% of his partnership share to the other partners for distribution. The Broussards argue that Paul Crochet agreed to a 10% reduction.
A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished. LSA-C.C. Art. 1906. Four elements are required for the confection of a valid contract: (1) the parties possess the capacity to contract; (2) the parties' mutual consent be freely given; (3) there be a certain object for the contract; and (4) the contract has a lawful purpose. First National Bank of Shreveport v. Williams, 346 So.2d 257 (La.App. 3rd Cir.1977); LSA-C.C. Arts. 1918, 1927, 1966, 1971.
The trial court found that the partners had not reached an agreement regarding Paul Crochet's 10%. Although we find that the parties had reached an agreement, we find that their agreement was conditioned upon Paul Crochet being able to slow down his work schedule. The trial court found that Paul Crochet was engaged in mid-1981 to perform detailed accounting work in the preparation of a federal estate tax return and was, therefore, unable to effect the slowdown he anticipated. This is corroborated by the partners' action to delay distribution of Paul Crochet's 10% until 1982, and their ultimate allocation of the 10% in question to Paul Crochet on the partnership's tax return for 1981. We have reviewed the trial court's determination of fact regarding the allocation of Paul Crochet's 10% and find no manifest error in the trial court's conclusions of fact. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978).
The Broussards further contend that Paul Crochet retired effective January 1, 1982, and that he agreed to compensation for his work until May 1, 1982, at the rate of $30 per hour and thereafter at $2700 a month. We disagree.
The learned trial judge made the following findings:
"It is clear to this Court and understandable that Paul Crochet was attempting to secure his retirement and a long-term lease was necessary for him to do this. The fact is no agreement was reached between the parties as to this, therefore, all negotiations concerning his retirement fell through. It is abundantly proven by both sides that there was `No meeting of the minds,' and no contract for Paul Crochet's retirement. To be sure, he had attempted to slow down his work, he had made arrangements for an hourly base when he did do work, and many other details were worked out between the partners concerning the retirement, but the crucial issue was never resolved, therefore all other issues had to fall.
* * * * * *

The Broussards presented a great deal of evidence and their attorney has presented legal arguments to show that the partnership agreement actually terminated prior to October 12,1982, in spite of the written agreement among the partners. This Court rejects that contention and the argument, on the basis that there never was a meeting of the minds as to the retirement of Paul *172 Crochet or the dissolution of the partnership, therefore, it continued until October 18, 1982 and up until that time the interest of the partners in the partnership was the same 35 percent, 35 percent, 15 percent, 15 percent as previously.

* * * * * *
[T]his Court found that there was a complete failure to effect a contractual [sic] agreement on ... the retirement,... The Broussards also claim that the funds paid to Paul Crochet for the hourly basis and the monthly basis during the tentative retirement try should be reimbursed to the firm, and in this they are correct in that that amount should be considered in a division of the profits of the partnership."
The record bears out the importance of the long-term lease to Paul Crochet's envisioned retirement and establishes that even as late as September 1982 John Broussard and Paul Crochet had not resolved the terms of the lease. Accordingly, we can find no manifest error in the trial court's determination concerning the issue of Paul Crochet's retirement; we further find that the trial court was correct in determining that Paul Crochet's earnings of $30 an hour and $2700 a month from May 1, 1982, should be considered in the distribution of his 35% in the partnership.

TRI-PARISH ACCOUNT
The Broussards contend that Paul Crochet owes them for the unbillable time of the Tri-Parish Oil Company account from 1977-1982 because Paul Crochet had an ownership interest in the company which he failed to divulge to the partners. We disagree.
In addressing this issue, the trial court made the following findings in its written reasons:
"... Paul Crochet is a minority stockholder in the Tri-Parish Oil Company and perhaps in fact while rendering accounting business to them the partnership charged less than they ordinarily would have. The partners and the partnership apparently had a very detailed accounting system whereby they could determine the `billable' office hours as well as nonbillable time, and from the use of this structure they could calculate rather accurately how much a client should be charged. Nevertheless, in the instance of Tri-Parish Oil Company and in other instances of the other partners, sometimes these clients would be charged less than perhaps they should have been. Perhaps sometimes they were charged more. Nevertheless, this was a business decision of the partnership and if they elected to give favorable rates to Tri-Parish Oil Company, that was a long-standing business decision that had remained with the partnership for a long time, and if it was a bad decision, then so be it. Mr. Crochet does not have to make up for the lack of hours in this liquidation."
Further, we find that the Broussards' argument falls on two grounds. First, as a Subchapter S Corporation, Tri-Parish's stockholders were reported on its tax return. From 1976-1979 John Broussard either prepared Tri-Parish's tax return or at least reviewed it; therefore, he cannot complain that Paul Crochet's ownership interest in the company was undisclosed. Secondly, there were numerous adjustments in the course of business to other accounts prepared by Crochet, Broussard & Company.
Accordingly, we find that the judgment of the trial court rejecting the Broussards' claims for reimbursement is not manifestly erroneous.

EVICTION
The Broussards argue that Paul Crochet wrongfully evicted them from the partnership premises on November 3, 1982, and, therefore, they are entitled to damages.
In conjunction with the termination of the partnership and the partnership lease the partners signed a document on October 21, 1982, which provided, in pertinent part:

*173 "It is understood that John E. Broussard and Paul K. Broussard planned to move to another location and vacate the Premises by October 31, 1982, but should such move not be possible by that date, it is agreed by and between Paul Crochet, as owner of the premises, and John E. Broussard and Paul K. Broussard, as the users thereof, that John E. Broussard and Paul K. Broussard may continue to use the premises for the purposes for which they are presently being used and that they shall pay to Paul Crochet as rental for such use, $20.84 per day; provided, however, that such right of continued use shall terminate on 11-10, 1982."

On November 1, 1982, the Broussards delivered the following notice of intent to Paul Crochet:
"This is to advise Paul Crochet that John E. Broussard and Paul K. Broussard intend to continue occupancy of their offices located at 302 Hacker St. through 11/10/82 at the rate of $20.84 per day as per previous written agreement dated 10/21/82."
The Broussards secured another office to conduct their business, and on October 31, 1982, advertised in the The Sunday Iberian, a local newspaper, the formation of their new partnership as well as their new business address. On November 3, 1982, Paul Crochet advised the Broussards to leave the premises of the old partnership and not to return.
The lessee of immovable property, in the absence of a violation of the contract, is entitled to peaceable possession of the premises during the continuance of the lease. LSA-C.C. Art. 2692; T.D. Bickham Corp. v. Hebert, 432 So.2d 228 (La.1983).
The trial court found that the Broussards' day-to-day lease ended when their new office was established as of October 31, 1982, and that Paul Crochet was justified in terminating the extended lease when he discovered that the Broussards removed, though inadvertently, several Crochet client files. Under these circumstances, we cannot say that the trial court was manifestly erroneous in denying damages to the Broussards for a wrongful eviction.

BROUSSARDS' MISCELLANEOUS CLAIMS
In a combined argument the Broussards contend Paul Crochet owes reimbursement to the partnership for expenses incurred by him in 1982 for continuing professional education, forty-four hours of vacation time, and for new tires mounted on his personal automobile. We disagree.
The record shows that in the past, the partnership paid for continuing professional education, each partner received two weeks paid vacation per year, and the partnership paid automobile expenses. Having determined that Paul Crochet was a partner until October 18, 1982, these expenses, incurred prior to that time, were clearly partnership expenses. Accordingly, we find no error in the trial court's disposition of these claims.

RENT
The Broussards claim that Paul Crochet owes the partnership $5000 for rent increases from January 1, 1982, through October 31, 1982.
Paul Crochet was the owner of the building in which the partnership accounting firm was located. Prior to 1982 the partnership paid Paul Crochet $750 per month for rent. Commencing January 1, 1982, Paul Crochet began collecting rent of $1250 per month from the partnership. Since there was no written agreement specifying a longer term, the partnership's rental of the building was on a month-to-month basis. LSA-C.C. Art. 2685.
Three things are necessary to form a contract of lease: the thing to be leased, the price of the lease; and consent of the lessor and lessee to the lease. LSA-C.C. 2670. The only objection the Broussards advance to the lease is that they did not consent to the lease increase.
Paul Crochet testified that he increased the rent in January 1982 based on an appraisal *174 of the property and after notifying the other parties. The partners each received a monthly computer printout of partnership expenses, including the rent. Also, the six-month recap of expenses for the first half of 1982 for rent is shown at $7500. Under these circumstances, we cannot say the trial court erred in rejecting the Broussards' claim.

DONATION
Paul Crochet argues that his movable assets acquired from October 1, 1959, until January 1, 1973, utilized for the benefit of the partnership from January 1, 1973, to October 18, 1982, remained his personal assets. In addressing this issue the trial court ruled that Paul Crochet donated these pre-1973 assets to the partnership because the partnership utilized these assets as depreciation write-offs. We disagree with the learned trial judge that this constituted a donation.
A donation inter vivos is an act by which the donor divests himself, at present and irrevocably, of the thing given, in favor of the donee who accepts it. LSA-C.C. Art. 1468. The general rule regarding the donation of an immovable or movable, corporeal or incorporeal, is that the donation must be made by an act passed before a notary and two witnesses. LSA-C.C. Arts. 1536, 1538. However, LSA-C.C. Art. 1539 is an exception to this general rule and provides:
"The manual gift, that is, the giving of corporeal movable effects, accompanied by a real delivery, is not subject to any formality."
Our jurisprudence holds that although mere delivery of a corporeal movable is sufficient to effect a change in ownership, the donee of a manual gift must show by strong and convincing proof that the donor had the intent to irrevocably divest himself of the thing and that real delivery was made. See Bergeron v. Bergeron, 411 So.2d 1183 (La.App. 4th Cir. 1982); Hayes v. Dompe, 331 So.2d 874 (La. App. 2nd Cir.1976); Succession of Broussard, 306 So.2d 399 (La.App. 3rd Cir.1975); Succession of Woolfolk, 225 La. 1, 71 So.2d 861 (1954). The alleged donor's outward acts, together with any admissible evidence of the relationship of the parties, are important to prove a manual donation. Pardue v. Turnage, 383 So.2d 804 (La.App. 1st Cir.1980).
We find the trial court erred in finding a donation of corporeal movables based on the partnership utilizing the movables in tax returns for depreciation write-offs. After a careful review of the record, we find that: there was no clear and convincing proof that Paul Crochet intended to make a donation; and the record is void of any proof that Paul Crochet divested himself presently and irrevocably of the movable assets. See Succession of Grubbs, 170 So.2d 256 (La.App. 2nd Cir.1964), writ denied, 247 La. 409, 171 So.2d 666 (1965); Dunham v. Dunham, 174 So.2d 898 (La. App. 1st Cir.1965); Succession of Sharpe, 158 La. 61, 103 So. 443 (1925).
Nothing in the record suggests that Paul Crochet donated any of his pre-1973 personal movable assets to the partnership or divested himself irrevocably of these assets. All that was established is that the partnership depreciated these assets on its tax returns. Furthermore, as a member of the accounting firm, Paul Crochet had the constant use of these items. It was, therefore, error for the trial court to rule that there was a donation.

ACCRUAL CONVERSION
Paul Crochet claims that John Broussard is accountable to him for fees which he received as of January 1, 1973, which were acquired because of work completed in 1972, prior to his entry into the partnership as a percentage partner. The trial court dismissed Crochet's claim finding no contractual agreement between the parties. Furthermore, Paul Crochet evidenced a donative intent for Broussard to participate in the unearned cash that was received in 1973. The record supports the trial court's determination and further we find that Crochet's claim prescribed.
*175 Pleadings should be construed so that the pleader will have his day in court; technical objections and harsh rules are not favored. Hodges v. LaSalle Parish Police Jury, 368 So.2d 1117 (La.App. 3rd Cir. 1979). The peremptory exception of prescription is one which must be specially pleaded. It cannot be supplied by the trial or appellate court even though it may appear valid. LSA-C.C.P. Art. 927.
The record shows that John Broussard specifically pleaded prescription in his answer to Paul Crochet's reconventional demand for the 1972 cash, which Broussard shared in 1973. John Broussard became an accountant for Paul Crochet's firm in 1967 and, although he became a certified public accountant in 1968, he remained an employee until 1971 when he became a partner with a guaranteed salary. It was not until January 1, 1973, that he began sharing a percentage of the profits.
The funds which Paul Crochet seeks to recover from John Broussard were earned in 1972 but not collected until 1973. An action against a partner to recover amounts advanced from the partnership is prescribed by ten years. LSA-C.C. 3499; Reddick v. White, 46 La.Ann. 1198, 15 So. 487 (1894). From Paul Crochet's own exhibit adduced at trial, the amount sought from John Broussard was calculated from a document prepared by John Broussard on December 31, 1972, which clearly established the amounts earned in 1972 but not yet collected. Paul Crochet's petition to recover these advances was filed on December 23, 1983, more than ten years after John Broussard became vested with an interest in these advances. Therefore, we conclude that Paul Crochet's claim to recover these advances had prescribed.

SEQUESTRATION
The Crochets contend that the trial court erred in granting the Broussards' writ of sequestration, and claim damages as a result of the issuance of the writ. They argue that once the partnership was terminated by mutual consent of the partners on October 18,1982, the partners became owners of the partnership assets in indivision; accordingly, they argue that the Broussards' remedy was to seek a partition of the property, not to secure a sequestration of the assets.
The following codal articles are applicable:
"LSA-C.C.P. Art. 3571
When one claims the ownership or right to possession of property, or a mortgage, lien, or privilege thereon, he may have the property seized under a writ of sequestration, if it is within the power of the defendant to conceal, dispose of, or waste the property or the revenues therefrom, or remove the property from the parish, during the pendency of the action."
"LSA-C.C.P. Art. 3573
The court on its own motion may order the sequestration of property the ownership of which is in dispute without requiring security when one of the parties does not appear to have a better right to possession than the other."
For us to uphold the trial court's use of a writ of sequestration we must find that (1) the ownership of the partnership assets is in dispute, and (2) the Crochets did not appear to have a better right to possession than the Broussards. See Boucher & Slack Contractors, Inc. v. McLean, 382 So.2d 1030 (La.App. 2nd Cir.1980), writ granted, 385 So.2d 794 (La.1980), writ recalled, 391 So.2d 840 (La.1980). The Crochets specifically placed the ownership of partnership assets at issue. Therefore, the first criteria for the issuance of the writ of sequestration, disputed ownership, was met. However, the second criteria, right to possession, is questioned. Relying on McVay v. McVay, 318 So.2d 660 (La.App. 3rd Cir.1975), the Crochets contend that their rights to possess the partnership assets are equal to that of the Broussards. In opposition the Broussards cite Donald v. Glazer, 194 So.2d 176 (La.App. 2nd Cir. 1967), writ refused, 250 La. 467, 196 So.2d 533 (1967) which held: *176 "Careful consideration of the reasons advanced by appellants in support of their motion for dissolution of the writ of sequestration has led us to the conclusion that a writ of judicial sequestration properly issued. It can hardly be questioned that Donald and Kitchens each had proprietary interests in the partnership property which at the time of the seizure was under the exclusive management of one of the partners. Likewise, the identity of the ownership of some of the property sequestered, whether by the partnership or by Maurice Glazer, was uncertain. During the pendency of the sequestration records and property were in custody of the sheriff and were available to all interested parties and we do not find that the defendants were seriously inconvenienced or suffered special damages."
We find no abuse of discretion on the part of the trial judge's issuance of a writ of sequestration under the particular facts of this case. The Broussards had been evicted from the former partnership premises, access to client files was in dispute, accusations of improper removal of client files had been leveled, and the Crochets did not appear to have a better right to possess the client files and all of the partnership assets. For the foregoing reasons we do not find that the trial court abused its great discretion in granting this conservatory writ.

USURY
The Crochets argue that the trial court erred in determining that a promissory note by the partnership to Paul Crochet was usurious, and, in denying their plea of prescription to the Broussards' usury claim.
On December 10, 1980, the partnership executed a $15,000 promissory note at 8% interest per annum to Paul Crochet for the purchase of a computer. Shortly thereafter the parties agreed to an interest rate of 17½% which was paid from January 1, 1981, through December 1, 1981; the total interest paid for this period was $2,301.74. From January 1, 1982, through December 1, 1982, the parties agreed to an interest rate of 15¾%; the interest for this second period totaled $1,185.82.
In its judgment the trial court granted Paul Crochet judgment on the principal amount of the note but declared the interest paid from January 1,1981, to December 1, 1982, usurious, and credited these interest payments against the note's principal balance.
The plea of usury is an affirmative defense. Crochet first contends that the Broussards did not specifically plead such a defense. See Preferred Inv. Corp. v. Denson, 251 So.2d 455 (La.App. 1st Cir.1971).
Where an affirmative defense has not been pleaded by defendant, but the plaintiff fails to object to the introduction of evidence that bears on the affirmative defense and that issue is not pertinent to any issues raised in the pleadings, defendant's pleadings are considered enlarged to include the affirmative defense, and the trial court can proceed as though the affirmative defense had been pleaded. See DLJ of Louisiana No. 1 v. Green Thumb, Inc., 376 So.2d 121 (La.1979).
The Broussards filed only a general denial to Crochet's reconventional demand on the promissory note. However, in a supplemental petition they sought collection of all interest in excess of 8%. At trial John Broussard particularly testified, without objection from Crochet, that Crochet's interest charges were usurious and asked for return of the interest. Therefore, we conclude that the pleadings were sufficiently enlarged to permit the trial court to consider the Broussards' affirmative defense of usury.
Any contract for the payment of interest in excess of that authorized by law shall result in the forfeiture of the entire interest so contracted. LSA-R.S. 9:3501. All sums collected as interest in excess of the maximum authorized by Civil Code Article 2924 are usurious and are forfeited to the borrower. Paulat v. Pirello, 353 So.2d *177 1307 (La.1977); Thrift Funds of Baton Rouge, Inc. v. Jones, 274 So.2d 150 (La. 1973), cert. denied, 414 U.S. 820, 94 S.Ct. 115, 38 L.Ed.2d 53 (1973). Usury is determinable on the face of the instrument. Grunewald v. Bartholomew, 269 So.2d 274 (La.App. 4th Cir.1972).
Paul Crochet collected twelve interest payments from the partnership at 17½% from January 1,1981, through December 1,1981, and eleven interest payments at 15¾%. Therefore, it is clear that these sums exceeded the amounts authorized by C.C. Art. 2924.
As an alternative argument Crochet urges that the usury laws do not apply to commercial transactions. In support of his position Crochet cites Gallent v. Womack, 415 So.2d 362 (La.App. 1st Cir.1982), which held that usury "has been interpreted to include interest charged to an individual, not in connection with a commercial business or [sic] transaction." We disagree.
At the time of the transactions in question C.C. Art. 2924 did not exempt interest charged for commercial or business purposes. Compare Paragraph D of C.C. Art. 2924 added by Acts 1984, No. 458, Section 1. With the exception of the Gallent case, which contained no citations in support of its holding, we have found no Louisiana authority prior to the 1984 amendment of Article 2924 for support of Crochet's proposition.
While we agree that the note was given in a commercial or business transaction (the CPA partnership's purchase of a computer) we have been shown no policy considerations or Louisiana authority to exempt these interest charges for 1981 and 1982 which are otherwise usurious under Article 2924. Accordingly, we reject Paul Crochet's argument that usury was inapplicable to the partnership transaction.
Crochet, citing Chadwick v. Menard, 104 La. 38, 28 So. 933 (1900), next argues that the Broussards' plea of usury is prescribed because the defense was not urged within one year of the last payment of interest. We disagree.
Even if the Broussards were barred from asserting an action to recover the usurious interest in a monied judgment (the last interest payment was made in November 1982 and the pleadings were enlarged in February 1984), where usury is pleaded as a defense to a claim for a monied judgment connected therewith the two year prescriptive period provided in C.C. Art. 2924 is inapplicable. Thrift Funds of Baton Rouge, Inc., supra. Accordingly, we find that the trial court was not manifestly erroneous in holding the interest payments were usurious, and in rejecting Crochet's plea of prescription.
For the foregoing reasons the judgment of the trial court is amended to provide that Paul Crochet's items owned by him prior to January 1, 1973, remain his personal items and were not donated to the partnership. In all other respects the judgment of the trial court is affirmed. Costs of this appeal are assessed equally against the plaintiffs, John Broussard and Paul Broussard, and the defendants, Paul Crochet and Mike Crochet.
AMENDED, AND AFFIRMED AS AMENDED.